# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. CARL BOND

**Appeal from the Criminal Court of Shelby County**
**No. 1001325     Chris Craft, Judge**

---

**No. W2011-02518-CCA-R3-CD  - Filed February 27, 2013**

---

Carl Bond ("the Defendant") was convicted after a jury trial of aggravated robbery. Following a sentencing hearing, the trial court sentenced the Defendant as a Range II offender to seventeen years, to be served in confinement at 100%.  On appeal, the Defendant contends that the evidence is not sufficient to support his conviction, that the trial court erred in its ruling on the admissibility of a prior conviction for impeachment purposes, and that the trial court imposed an excessive sentence.  Upon our thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Phyllis Aluco (on appeal) and Jim Hale (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Carl Bond.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E.  Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Christopher West, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted on one count of aggravated robbery which occurred on September 14, 2009.  He proceeded to a jury trial on the indicted offense in August 2011, and the following proof was adduced:

Tracey Steele, the victim, testified that on September 12, 2009, she was at the "Southern Heritage Classic"[1] in Memphis, Tennessee, and met the Defendant, whom she previously had not known, that evening at approximately 5:00 p.m. On cross-examination, she clarified that she "met him while [she] was riding" and that their vehicles were "side by side[.]" She and the Defendant exchanged numbers, and the Defendant told her his name was "Suave." After meeting the Defendant, Steele "[w]ent to the game."

Later that night, after the game, the Defendant called Steele while she was on her way downtown to Beale Street.[2] Steele learned that Beale Street had closed early because of a shooting, so she and the Defendant arranged to meet at the Exxon on Poplar Avenue and Danny Thomas Boulevard. However, "the lot was so crowded" at the Exxon that the Defendant instead told Steele to meet him at the BP on Poplar Avenue and Dunlap Street, which was approximately one block away. Steele met the Defendant at the BP between 2:00 and 3:00 a.m. According to Steele, she and the Defendant "sat in the car and talked for like forty-five minutes or an hour, getting to know each other." They parted ways after their conversation and made plans to call each other later.

Steele and the Defendant talked again on the phone on Sunday, September 13th. On cross-examination, Steele testified that the Defendant called her from a different phone number that day. He told her that he was calling her from a different phone number because his cell phone was a prepaid phone "run by minutes." Later that evening at approximately 6:00 p.m., Steele and her sisters went to a casino. They returned between 11:30 p.m. and midnight.

Steele called the Defendant Monday morning, September 14th, and told him what she won at the casino Sunday night.[3] She also talked to the Defendant throughout the course of the day. The Defendant and Steele made plans to go out to eat at Applebee's and then watch a movie at the "Paradiso on Poplar" later that evening. On cross-examination, Steele explained that she and the Defendant first planned "to go to [the Defendant's] grandma's house . . . so he could park his truck and get in the car with [her]." However, because she

---

[1] The "Southern Heritage Classic" is an annual event in Memphis involving a college football game between Tennessee State University and Jackson State University and other activities.

[2] On cross-examination, defense counsel presented Steele with her cell phone records, which previously had been entered as an exhibit pursuant to a stipulation. Defense counsel pointed out that the first call made was from Steele's cell phone to the Defendant's cell phone.

[3] Steele did not testify at trial to the actual amount that she won at the casino or to the amount that she told the Defendant she won at the casino.

did not know the area where the Defendant told her that his grandmother lived, the Defendant instead was supposed to meet her at the Exxon.

Steele also testified that on Monday she and the Defendant "had been looking for us some weed all that day, and he was looking for it, and I was looking for it." Once Steele "finally found some," she sent the Defendant a text message and told him. Steele bought enough for "two blunts," "just a little baggie."[4] Steele then left to meet the Defendant at the Exxon where they previously had arranged to meet, and she called him to tell him that she was on her way. On cross-examination, Steele described that while she was on her way to the Exxon, the Defendant continually called her, asking, "You coming? You made it yet? You made it?"

When Steele arrived at the Exxon, she called the Defendant, but the Defendant told her he left "because some officers pulled on the lot, and he didn't have any license." The Defendant told Steele to meet him at "some apartments off Highland," and the Defendant gave Steele directions to the location. Steele described these "apartments" as "duplex housing" ("duplex apartments") and said that they "look like a regular neighborhood." When Steele arrived at the duplex apartments, she did not see the Defendant's truck and tried to call him, but he did not answer. Thus, Steele drove to the end of the road and made a U-turn at the stop sign to leave. After she made the U-turn, she saw the Defendant's truck "coming like out of the driveway" of one of the duplex apartments, and "he was going back around the way that [she] came in." The Defendant then called her asking where she was, and she told him that she was right behind him. He stopped on the street and told her that "he fixing [sic] to go to his grandma's house and he'll get in the car with" her there.

Steele then followed the Defendant to one of the duplex apartments which she believed to be his grandmother's. The Defendant pulled into the driveway, but he parked his truck at the end of the driveway, close to the road. There was not enough space for Steele also to park her car in the driveway, so she parked on the side of the street to wait for the Defendant to get into her car. According to Steele, when the Defendant got into the passenger seat of her car, he was on his cell phone, and she heard him say, "Yeah, you know I'm Carlos. You know my name Carlos."

When the Defendant got into Steele's car, he told her to "back up and pull in the driveway" across the street from his grandmother's house while "he rolled the blunt." She complied. Once the Defendant ended his phone call, Steele stated that he started "to roll the

_____

[4] On cross-examination, Steele described that she "couldn't find . . . regular weed, so [she] ended up finding some kush." She agreed that "kush" is considered a "very high grade . . . marijuana" and that it is "[p]retty expensive."

blunt up." On cross-examination, Steele explained that the "kush" had been in her purse before she gave it to the Defendant.

Steele testified that, while waiting for the Defendant to get into her car, she saw two "boys"[5] "at that stop sign [she] had made a U-turn at," but she "didn't think nothing [sic] of it." The stop sign was "roughly about eight houses down the street" from the Defendant's alleged grandmother's house, which was located in the middle of that street of duplex apartments. Steele testified that "not even a minute" after pulling into the driveway across the street from the Defendant's alleged grandmother's house, the cohorts "had made it right past [her] car." They were on the opposite side of the street, and they were approximately one house away from the driveway in which she was parked. According to Steele, the Defendant said, "'Robert, it's you?' He was like . . . , 'Yeah, that's me,' and the two [cohorts] start[ed] coming across the street."

The cohorts then approached the passenger side of the car, where the Defendant was seated. The three of them "shook hands, started talking, and . . . [one of the cohorts] was asking [the Defendant] where he was fixing to go." The Defendant responded that they were "fixing to go out." Then, Cohort One said, "Damn, she pretty." The Defendant told him to "[g]o around and holler at her." Steele testified, "Before I can even look to the left, [towards the driver's side window,] it was a gun at my head. [Cohort One] had my hair and my ponytail pulling me out of my car." Steele stated that she saw the gun because Cohort One "hit [her] on the forehead with it." Steele then described how Cohort One pulled her out of her car:

> It was like he came through the window[, which was open,] and grabbed me by my hair, and he opened up the door – he had to open up the door with the hand he had the gun in because he opened up my door, and he pulled me out. The way he pulled me out, I twist around but by him having a gun on me, and I couldn't lay down, I was constantly turning over and looking like, "Please don't kill me, please don't kill me."

According to Steele, the Defendant was sitting in the passenger seat when Cohort One pulled her out of her car.

Steele testified that, after Cohort One pulled her out of her car, she was lying down on the ground "with the gun pointed on [her]." She did not "know what [the Defendant] was doing at this time," but she saw Cohort Two "grab [her] purse and grab [her] car keys."

_____

[5] We will refer to the "boys" individually as "Cohort One" and "Cohort Two" and collectively as "cohorts."

Cohort One then yelled, "Where the rest of the money at? Where your money at? Where your money at?" She responded, "I ain't got no money" and "was . . . pleading for [her] life." Simultaneously, Cohort One "was constantly shoving the gun in [her] back trying to push [her] head down in the dirt." The Defendant then "came and grabbed the gun from [Cohort One]." The Defendant immediately "cocked it" and told her, "B***h, if you scream, I'm going to blow your head off." At some point, Cohort Two came around to the driver's side of the car and saw her cell phone, which had fallen between the seats when Cohort One pulled her out of her car, and he grabbed it as well. Steele testified that she "feared for [her] life" during these events.

On cross-examination, Steele denied previously stating that the gun was black and instead stated that it was "chrome." Defense counsel asked Steele whether she recalled stating, in her prior statement, the following: "[T]he second guy was armed with a black Glock, and he gave it to the first guy I knew after he got aggressive with me[.]" She agreed that she made that statement to the detectives. She also agreed, on cross-examination, that she stated at the preliminary hearing, "I really couldn't see [the gun] because it really caught me off guard, off guard, because I still, you know, was in shock. . . ." She then added, however, "But I saw the gun when [the Defendant] grabbed the gun. He came and got the gun from [Cohort One], and he stood over me. [Cohort One], he had my hair and the gun. I mean he was constantly pushing my head and grab – trying to get me to lay down, but I wouldn't lay down, so [the Defendant] came and grabbed the gun."

Steele then testified that, after the Defendant grabbed the gun from Cohort One and threatened her, a "green pickup truck" that "had a boat on the back" "came down the street." She added, "[A]s that truck, that green truck, came down the street, the [cohorts], they start[ed] backing up, and then [the Defendant], he was like, 'If you run, if you get up, I'm going to shoot. I'm going to kill you, get up and scream or get up and run or do anything.'" The cohorts then jumped inside the Defendant's truck which was still parked in the driveway across the street, and the Defendant jumped in the back of his truck and "laid down flat in the flatbed." One of the cohorts drove the Defendant's truck, with the Defendant in the bed of it, towards the stop sign at which Steele had made a U-turn earlier.

After the green pickup truck came down the street, a lady driving a green Cavalier, whom Steele believed "had to see the end of what had happened," stopped to help her. Steele and the lady attempted "to chase them" in the lady's Cavalier while Steele was on the phone with the police, but the lady took a wrong turn and ended up back on the same street where the duplex apartments were located.

The next day, Tuesday, September 15th, a detective asked Steele to come to the police department to look at photographs of potential suspects. Because she heard the Defendant state that his name was "Carlos" while he was on his cell phone, the police initially limited

the photographic lineups of potential suspects to men named "Carlos." Steele believed she viewed "at least eleven hundred Carloses" on the computer at the police department. She did not, however, identify the perpetrator when she was looking through the photographs of potential suspects named "Carlos."

Eventually, Steele identified a photograph of the Defendant while looking at a photographic lineup on the computer at the police department. On cross-examination, Steele explained that her cell phone records were "pulled" to get the number from which the Defendant called Steele. Then, "they retraced [the Defendant's] number, and when they retraced the phone records on his phone, there was no name. . . . It was just a birth date." A detective entered his birth date into the database to limit the search of potential suspects. Six new photographs of potential suspects were displayed on the computer, and Steele identified one of the photographs as her perpetrator. The individual in the photograph later was identified as the Defendant.

After the positive identification, Steele circled the photograph of the perpetrator who robbed her and signed it. She also wrote out a short statement on the photographic lineup. Later, she made a full statement to the detectives. Steele identified the printed-out photographic lineup at trial, and it was entered as an exhibit. She stated on cross-examination that she did not learn the Defendant's real name until sometime after she identified him as her perpetrator in the photographic lineup. Steele also agreed that she did not say anything to the detectives about the "kush" until they confronted her about it because she "didn't think it was a major part because it wasn't about no drugs. It was about [the Defendant] robbing [her] and thinking that [she] wasn't going to know who he was."

Lastly, Steele testified that the following items were stolen from her: her purse, cell phone, car keys, and a necklace. Inside her purse, she had over five hundred dollars in cash which also was taken. Steele did not give the Defendant permission to take anything from her.

Durand D. Martin, a lieutenant with the City of Memphis Police Department ("MPD"), testified that, in September 2009, he was an investigative sergeant in the robbery bureau and was assigned to the "Investigative Crimes" unit. His job responsibilities consisted of "put[ting] together case files." In this case, Lieutenant Martin requested the Defendant's consent to search his cell phone. The Defendant gave Lieutenant Martin permission to search his cell phone, and the Defendant signed a consent to search form. Lieutenant Martin looked through the Defendant's text messages on his cell phone and took photographs of two text messages that were sent from Steele's cell phone to the Defendant's

cell phone on Monday, September 14th. The photographs were admitted as an exhibit.[6] On cross-examination, Lieutenant Martin agreed that he looked through the Defendant's cell phone and photographed the text messages after he interviewed the Defendant.

Walter Davidson, a lieutenant with the MPD, testified that, in September 2009, he was a lieutenant in charge of the "Task Force out of the Tillman Station." Lieutenant Davidson's job responsibilities consisted of reviewing "the crimes . . . within that precinct and read[ing] the cases and find[ing] out if there were any cases that [he] could work on to lower or reduce crime in the Tillman Station." He stated that this case was one of those cases.

Lieutenant Davidson called Steele on Tuesday, September 15th, and asked her to come to the police department so that he could try to "develop the suspect that robbed her." While discussing the events leading up to the robbery, Steele mentioned to Lieutenant Davidson the nickname "Suave," the name "Carlos," and that the perpetrator was a black male. Lieutenant Davidson utilized a database at the police department that retrieves photographs of individuals in their system that match the description entered. Here, Lieutenant Davidson entered into the database the name "Carlos" and the term "black male." This description produced approximately one hundred pages of photographs on the computer, with six photographs per page. Steele looked through those photographs on the computer, but she did not identify anyone as the perpetrator that robbed her.

While Steele was at the police station, however, Lieutenant Davidson "develope[d] a phone number" for the perpetrator that robbed Steele. On cross-examination, Lieutenant Davidson stated that he learned the Defendant's cell phone number when he showed Steele her cell phone records, and she identified the number from which "Suave" had called her. He added that he was attempting to obtain a name from the cell phone number but only was able to obtain a birthday. Lieutenant Davidson then entered "black male" and the birthday into the database. When the computer produced a photographic line-up of six new potential suspects, Steele "jumped out of her chair and said, 'That's him right there.'" Lieutenant Davidson printed a copy of the "exact screen that popped up which she saw." Lieutenant Davidson then requested that Steele circle the perpetrator who robbed her and sign it, which she did.

The State rested its proof, and the Defendant moved for a judgment of acquittal. The trial court denied the motion.

---

[6] Lieutenant Martin did not read the text messages to the jury. However, the exhibit was published to the jury. The text messages, which were sent from Steele's cell phone to the Defendant's cell phone, stated the following: (1) Monday, September 14th at 3:56 p.m. "Wuz up 'sweet'"; and (2) Monday, September 14th at 4:25 p.m. "Got kush ---------- Whats up bay."

Thereafter, the defense requested a Tennessee Rule of Evidence 609 hearing to determine the admissibility of the Defendant's prior criminal convictions for impeachment purposes because, at that time, the Defendant "indicated he want[ed] to testify." The trial court recited the Defendant's prior record, including the conviction dates, as follows: (1) attempted possession of cocaine with intent, October 7, 2008; (2) felon in possession of a handgun, July 10, 2001; (3) aggravated robbery, July 10, 2001; (4) criminal attempt unlawful possession of a controlled substance, January 12, 1998; and (5) aggravated robbery, January 6, 1997. The State responded that the two convictions from 1997 and 1998 were included for enhancement purposes only, not for impeachment purposes. The trial court ruled that both the October 2008 conviction for attempted possession of a controlled substance and the July 2001 aggravated robbery conviction were admissible for impeachment purposes, but that the other three convictions were not admissible.

The Defendant waived his right to testify and presented no proof. At the close of proof, the jury deliberated and returned a guilty verdict for aggravated robbery.

At the sentencing hearing, the presentence report was admitted as an exhibit without objection. Also admitted were certified copies of judgments of the Defendant's prior felony convictions. The trial court determined that the Defendant was a Range II offender, and it then applied two enhancement factors: (1) the Defendant has a previous history of criminal convictions or criminal behavior in addition to those convictions used to establish the appropriate range; and (2) the Defendant was a leader in the commission of an offense involving two or more criminal actors. The trial court sentenced the Defendant to seventeen years, to be served in confinement at 100%.

The Defendant filed a motion for judgment of acquittal, or in the alternative, motion for new trial. The sole ground presented for review in the motion and at the hearing was a challenge to the sufficiency of the evidence. The trial court denied the motion, and the Defendant timely appealed. On appeal, the Defendant contends that the evidence was not sufficient to support his conviction, that the trial court erred in its ruling on the admissibility of his prior aggravated robbery conviction for impeachment purposes, and that the trial court imposed an excessive sentence.

## Analysis

### Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence supporting his aggravated robbery conviction. The Tennessee Rules of Appellate Procedure provide that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a

reasonable doubt." Tenn. R. App. P. 13(e). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003).

*Aggravated Robbery*

The Defendant was convicted of aggravated robbery. He contends that the evidence was insufficient to convict him of this offense.

Our criminal code provides that aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a) (2006), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[,]" id. § 39-13-402(a)(1) (2006). A person commits theft of property "if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control

over the property without the owner's effective consent." Id. § 39-14-103 (2006). A deadly weapon, for purposes of this statute, is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]" Id. § 39-11-106(a)(5)(B) (2006).

In this case, the Defendant claims that the evidence failed to establish an essential element of aggravated robbery - that "he knowingly obtained or exercised control of any of Ms. Steele's property without her consent."[7] We hold that the evidence is sufficient to sustain the Defendant's conviction for aggravated robbery. The proof established that the Defendant knew that Steele won money at a casino on Sunday night, September 13th. The next day the Defendant and Steele made plans to meet that evening at the Exxon on Poplar Avenue to go out to eat and to a movie together. When Steele arrived at the Exxon, the Defendant was not there. Steele called the Defendant, and he told her to meet him at "some apartments off Highland." He gave her directions to this location; parked his truck in his alleged grandmother's driveway, close to the road; and got into the passenger seat of Steele's car. The Defendant then instructed her to pull into the driveway directly across the street from his truck. Next, the cohorts approached Steele's car, spoke to the Defendant briefly, and the robbery ensued. While the Defendant did nothing to protect Steele, the cohorts took her purse, car keys, cell phone, and necklace. During the offense, Cohort One kept demanding the "rest" of Steele's money, permitting the inference that the Defendant had told him about Steele's casino winnings. The circumstances of the robbery, including the Defendant's directing the victim to a different location to meet him and further instructing her where to park, followed immediately by the appearance of the cohorts, permitted the jury to infer that the Defendant planned the robbery. Moreover, the proof established that the Defendant took the gun from Cohort One during the robbery, "cocked" it, and threatened Steele's life. It was not until another vehicle drove towards their direction that the Defendant and the cohorts fled to the Defendant's truck and left the scene in his truck.

The proof established that the Defendant, acting in concert with the cohorts, robbed the victim of her purse, which contained over five hundred dollars; her car keys; her cell phone; and her necklace. See, e.g., State v. Antonia M. Byrd, No. 02C01-9508-CR-00232, 1997 WL 1235, at *5 (Tenn. Crim. App. Jan. 2, 1997), perm. app. denied (Tenn. Sept. 22, 1997) (holding that the evidence was sufficient to sustain the defendant's conviction for especially aggravated robbery as "either a principal offender or responsib[]le for the acts of the others" where the defendant acted in concert with his cohorts and "helped plan the car theft," "exercised control over the victim for part of the time the robbery took place," and

_____

[7] Although the Defendant refers in his brief to the statutory language "or exercised control of," the jury only was instructed that for "you to find the Defendant guilty of this offense, the state must have proven beyond a reasonable doubt . . . that the [D]efendant knowingly obtained property owned by Tracey Steele."

"struck the victim during the series of events causing her serious injury and, ultimately, her death." The court further noted that "[t]he robbery, at the point of his participation, was of a continuing nature.") Thus, the Defendant's challenge to the sufficiency of the evidence avails him no relief.

In conjunction with contending that the evidence is insufficient, the Defendant points out that the trial court failed to instruct the jury on criminal responsibility as a theory of his criminal liability for the aggravated robbery. Because we hold that the evidence is sufficient to establish the Defendant's guilt as a principal offender, even if the trial court erred in failing to instruct on this theory of liability, the error would be harmless. Accordingly, the Defendant is entitled to no relief on this basis.

**Prior Aggravated Robbery Conviction**

The Defendant next argues that the trial court committed plain error in ruling that his prior aggravated robbery conviction was admissible for impeachment purposes. The doctrine of plain error provides that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). This Court has the discretionary authority to grant relief for plain error when all of the following five prerequisites are satisfied: "(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice." State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010) (citing State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007)). We need not consider all five factors when the record clearly establishes that at least one of the factors is not met. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). It is the defendant's burden to persuade this Court that the trial court committed plain error and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." Hester, 324 S.W.3d at 56; see also State v. Bledsoe, 226 S.W.3d 349, 354-55 (Tenn. 2007).

The record clearly establishes what occurred in the trial court with regard to this issue. Moreover, it is evident from the record that the Defendant did not waive this issue for tactical reasons because he objected to the admissibility of this prior conviction in the trial court. However, we need not determine whether the trial court erred in determining that the Defendant's prior aggravated robbery conviction was admissible for impeachment purposes because we conclude that substantial justice does not require relief. See Hatcher, 310 S.W.3d at 808. Specifically, the Defendant failed to establish that the outcome of his trial probably would have changed had he testified because the record contains no indication of what the Defendant's testimony would have consisted of at trial. For instance, neither opening nor

closing arguments were included in the record on appeal, no witnesses testified for the defense, and the Defendant did not make an offer of proof as to what his testimony would have been. Accordingly, we cannot discern the defense theory. Although a defendant is not required to make an offer of proof of his proposed testimony, "[d]epending upon the facts and circumstances of a case, an offer of proof may be the only way to demonstrate prejudice." See State v. Galmore, 994 S.W.2d 120, 125 (Tenn. 1999) (examining the theory of defense, including any evidence that the defendant presented at trial as well as defense counsel's closing argument, in determining whether an erroneous ruling on the admissibility of prior convictions for impeachment purposes "more probably than not affected the judgment to the defendant's prejudice"). Accordingly, the Defendant is not entitled to plain error relief on this issue.

**Sentencing**

Lastly, the Defendant challenges the length of his sentence. He argues that his sentence should be reduced because the trial court erroneously relied upon an enhancement factor that was not established by the proof in determining the Defendant's sentence.

On appeal, when the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2006). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[,]" and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

In this case, the trial court determined that the Defendant was a Range II offender. The Range II sentence for aggravated robbery, a Class B felony, is twelve to twenty years. Tenn. Code Ann. §§ 39-13-402(b); 40-35-112(b)(2) (2006). The trial court then determined that two enhancement factors applied: "(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" and "(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors[.]" Id. § 40-35-114(1), (2) (Supp. 2007). The Defendant submitted no mitigating factors for the trial court's consideration, and the trial court did not state that any applied in this case. The trial court sentenced the Defendant to a mid-range sentence of seventeen years to be served in confinement. Lastly, the trial court ordered that the Defendant serve 100% of his sentence pursuant to Tennessee Code Annotated section 40-35-501(k)(1) (Supp. 2007), which states, "There shall be no release eligibility for a person committing aggravated robbery, as defined in § 39-13-402, on or after January 1, 2008, if the person has at least one (1) prior conviction for aggravated robbery, as defined in § 39-13-402[]. . . . The person shall serve one hundred percent (100%) of the sentence imposed by the court. . . ."

In this case, we discern no error regarding the trial court's application of the two enhancement factors. The proof submitted at the sentencing hearing supports the trial court's conclusion that the Defendant has a previous history of criminal convictions and criminal behavior. Specifically, in addition to the Defendant's two prior aggravated robbery convictions used to establish his range, he had at least three additional felony convictions, several misdemeanor convictions, and a history of illegal drug use. The proof also supports the trial court's conclusion that the Defendant was "a leader in the commission of an offense involving two or more criminal actors." This Court has held that "'enhancement for being a leader in the commission of an offense does not require that the [defendant] be the sole leader but only that he be 'a' leader in the commission of the offense.'" See State v. Holston, 94 S.W.3d 507, 511-12 (Tenn. Crim. App. 2002) (quoting State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993)). As set forth above, the proof established that the Defendant

planned the robbery in this case. See supra pp. 17-18. This is sufficient evidence to establish that the Defendant was a leader in the commission of the aggravated robbery. Cf. State v. Freedom, 943 S.W.2d 25, 30 (Tenn. Crim. App. 1996) (in holding that the trial court erred in applying this factor, this Court discussed that there was "no evidence in the record that the defendant somehow planned th[e] encounter" with the victim); State v. Denise Dianne Brannigan, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *17 (Tenn. Crim. App. June 13, 2012) (holding that the trial court erred in applying this factor because "there was no evidence presented at trial indicating that the [d]efendant planned the crimes or encouraged her co-defendant to participate in [the] offenses").

We also discern no error by the trial court in ordering the Defendant to serve seventeen years in confinement. The Defendant's sentence is within the appropriate range, and the record demonstrates that the sentence is in compliance with the purposes and principles of the Sentencing Act. Accordingly, the Defendant is entitled to no relief on this basis.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE